IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| GAIL SCOTT, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:10-cv-930 (AJT/TCB) |
| HEALTH NET FEDERAL SERVICES, LLC, | ) ) ) ) |
| Defendant. | ) ) |

## **MEMORANDUM OPINION**

In this employment discrimination action brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, plaintiff alleges (1) that she was unlawfully harassed and treated differently on the basis of her race and sex, and (2) that she was unlawfully terminated on the basis of her race and sex and in retaliation for her complaints about her harassment and disparate treatment. Presently pending are defendant Health Net Federal Services, LLC's ("Health Net's") Motion for Summary Judgment [Doc. No. 88] (the "Motion") and Motion to Strike Plaintiff's Unauthorized Supplemental Pleadings [Doc. No. 122] (the "Motion to Strike"). Upon consideration of the Motion, the memoranda and exhibits in support thereof filed by Health Net, and the memorandum and exhibits filed in opposition thereto by plaintiff Gail Scott on June 17, 2011, in compliance with this Court's Order dated June 6, 2011, the Court finds that there are no triable issues of material fact and that Health Net is entitled to judgment as a matter of law. For the reasons stated below, the Court also finds that the Motion to Strike is meritorious and will be granted.

1

## I. **BACKGROUND**

### A. Facts

The facts, viewed in the light most favorable to plaintiff, are as follow. Plaintiff is an African-American female. Her direct supervisor during the events at issue in this case was a white female, Roxana Worden. Worden, in turn, reported to Eileen Yaeger, who was also a white female. Throughout plaintiff's employment, all or substantially all of the employees in her department were female.

Plaintiff is a registered nurse ("RN"). Beginning in August 2006, plaintiff worked for Health Net as a Transition Care Manager. In this capacity, plaintiff conducted pre-admission counseling and prospective discharge planning activities. According to Health Net, by June 2008, plaintiff began to have performance problems, which resulted in the issuance of Performance Improvement Documents ("PIDs") in June 2008 and April 2009. In subsequent meetings and correspondence, plaintiff complained about Worden's attitude and demeanor toward plaintiff, the accuracy of information that Worden included in the April 2009 PID, and Health Net's response to her complaints. In a statement disputing the April 2009 PID, plaintiff stated:

> None of the statements supplied by [Worden] about me are true ... Is this also about the evil twins [who] many have fought to leave behind?['] I hope not, but like the old man's lament, 'I married 8 times, this one is the 9th marriage, and I have not once seen mistreatment such as this! I guess it is still so, women are often assigned the blame that is due their entire household. [Senior Organizational Effectiveness Consultant Rita Siegl] said she is not diminishing my complaint of harassment, but what about a company that does not guard against it?
>
> None of the statements written by [Worden] about me are true, and even if they were, which I can assure that they are not, she went about addressing herself to me the wrong way...

Statement of the Problem, Siegl Dec., Ex. 6 [Doc. No. 89-1, at 35]. When asked what she meant by a reference to the "evil twins," plaintiff responded that she mean racism and sexism.

In June 2009, after a meeting with Worden, plaintiff complained to Phil Davis, a Corporate Vice-President, that she felt Worden had harassed her by staring at her with her hands on her hips and legs astride while plaintiff spoke to a provider on the phone.

In September 2009, plaintiff was summoned to a meeting to discuss provider complaints about plaintiff, and these issues culminated in an additional written warning on October 1, 2009.

On September 23, 2009, plaintiff met with Worden to review her 2009 mid-year performance review, in which she was rated as "Not on Track." The review also stated that plaintiff was "still not meeting key performance standards." In response, plaintiff commented that "concerns of harassment have persisted" and otherwise complained that the evaluation was "subjective." 2009 Mid Year Performance Review Form, Scott Dep., Ex. 13, at 6 [Doc. No. 89-3, at 65].

On October 1, 2009, Worden, Yaeger and Siegl met with plaintiff to deliver a PID, identified as a "Written Notice (Final)." This document included complaints from health care providers in August and September, including complaints that plaintiff was "rude" and "mean," failed to help complete authorization requests, failed to use the resources available to her to obtain necessary clinical information, and failed to provide assistance or refer an inquiry to an appropriate Health Net employee because plaintiff did not view responding to the inquiry as part of her responsibilities. In response, plaintiff filed a statement that stated:

3

> There are those whose purpose is to destroy the works of those more skillful, such an attitude compounded with racism and sexism ... Who gets wrote up for 'he-said, she-said' stuff or for what could have happened? Customers complain, but what kind of a person escalates that? The write up process feels like the Middle Passage, what my ancestors (of the Middle Passage) went through ... Beyond that Health Net wants to be the best of its brand; 1) Stop mixing honey with rotten meat, and 2) Take care of your employees, some of whom are suffering from mental and emotional issues. EAP is a start, but for me I dance, practice yoga, write to cope, and stay in balance.

Associate's Comments, Siegl Dec., Ex. 22 [Doc. No. 89-1, at 85].

The events that directly resulted in plaintiff's termination began in late October, 2009 in connection with what has been referred to in this action as the "Baby Girl" incident. On October 27, 2009, plaintiff met with Worden and Yaeger to ask if Health Net could execute a letter agreement with a non-certified home health agency to provide care for an infant, referred to in this litigation as "Baby Girl," whose discharge plan included home health care. Plaintiff was directed to contact the hospital and tell them that Health Net could not authorize a non-certified provider and to work with the hospital to secure a TRICARE-certified home health agency.

On October 28, 2009, plaintiff informed Worden that the hospital could not find a home health agency for Baby Girl and requested assistance. Worden and other Health Net employees gave plaintiff resources to check in order to locate a home health agency for Baby Girl. Plaintiff was aware that Baby Girl had been discharged from the hospital, but did not inform Worden of this fact or that home health had been ordered but not secured by the hospital. At 3:30 p.m., plaintiff informed Yaeger that she could not locate a home health agency that could provide the needed services. Yaeger then contacted the hospital discharge planner who informed Yaeger that she had received a voicemail from plaintiff that morning stating that the non-certified provider could not be authorized, but

4

did not mention any assistance with locating an alternative provider. Yaeger also contacted the hospital case manager, who told her that plaintiff should have known that the discharge was planned for that week because that information was included in clinical information that she had faxed to plaintiff the prior week, and that Baby Girl had been in the hospital for forty-nine (49) days. At 4:00 p.m., plaintiff reported that she had located an agency that could provide care beginning on October 30, but required TRICARE approval for 4 hours of home health care each day. Yaeger asked plaintiff if the agency was sending an RN, and plaintiff replied that it was. Yaeger then asked plaintiff to contact the agency and obtain the billing codes so that coverage for Baby Girl could be verified.

On the morning of October 29, 2009, Yaeger asked plaintiff if she had obtained the billing codes. Plaintiff replied that she had not. Later that morning, plaintiff informed Yaeger that Worden had sent the agency a request form and that the agency would return the form with codes. Plaintiff subsequently told Yaeger that the agency would be providing an RN. However, when Yaeger contacted the agency around mid-day, the agency told her that they had no RNs and had planned to send a home health aide. Upon learning of this, plaintiff was directed to return to her work station and continue searching for an appropriate home health provider. Plaintiff subsequently told Worden that she had called every agency and there was no one left to call. Yaeger, however, started to call Health Net's on-line list of home health agencies and quickly located a home health agency that could begin services the following day.

According to Health Net, Yaeger decided that counseling had been ineffective and that it was time to terminate plaintiff, and plaintiff was terminated on November 4, 2009,

due to her failure to appropriately follow up on Baby Girl's case pursuant to Health Net's procedures. There is no evidence in the record regarding who, if anyone, Health Net hired to replace plaintiff.

With respect to her termination, plaintiff generally disputes that her performance was deficient, but states that she "recalls nothing of substance in meetings re: job performance documents by Defendants." Opp. to Mot. for Summ. J., at 7-8. With regard to the Baby Girl incident, plaintiff cryptically states in a belated surreply, which is one of the subjects of the Motion to Strike, that:

> The hospital for the Baby Girl provided the home health agency for the discharge. This document clearly and accessible for Ms Worden in case notes for baby girl.

July 8th Notes [Doc. No. 121], at 6-7.

Plaintiff also alleges generally that "Worden did not like black people, she did not understand her black employees," she did not get along with plaintiff "nor the other African American women in the department," and that she was "not respectful towards" plaintiff. Opp. to Mot. for Summ. J., at 2-3. Plaintiff also makes numerous conclusory allegations of racism generally directed to Health Net. *See e.g.* July 8th Notes [Doc. No. 120], at 4 ("Plaintiff said to Ms. Siegl: 'this company belongs to people over seas, Jewish people, and it is through members of the US Congress that the company is (financially and administratively) set up to mistreat blacks, mainly females, and what were they expecting me to do?'") (emphasis omitted). However, plaintiff does allege with somewhat more specificity, albeit for the first time in her opposition to Health Net's Motion, that she was exposed to what she characterizes as a racist symbol:

> Ms Yaeger had racist symbol on her desk re: daughters of the confederacy memorabilia. Plaintiff found the item offensive for the workplace and

> insensitive. Ms Yaeger never removed it nor addressed Plaintiff complaint that it is offensive.

Opp. to Mot for Summ. J., at 4. Plaintiff also contends that she was required to work on the Martin Luther King Jr. Holiday in January 2009. According to plaintiff:

> ***Ms Worden used force re: Plaintiff to work that day. In fact, some of the white employees banded together and arranged it as a regular work day, and they did indeed work that year for Dr. King's Holi Day.*** Ms Worden in that meeting with Plaintiff was negative in attitude about Dr. King's upcoming Holi Day, trying to get all the black employees to work it, and Plaintiff noted it related to blacks. Plaintiff saw Ms Worden did not like blacks, was uncomfortable. Ms Worden responded by gritting her teeth, looking like she was about to explode at Plaintiff, and she threw some papers across the desk at the Plaintiff. Plaintiff, upon leaving Ms Worden's office, indicated she was asking Eileen Yaeger to come in, "she could not handle it".

Opp. to Mot for Sum. J., at 6-7 (emphasis original). Plaintiff concedes, however, that no one ever made any racist comments to her or heard any racist comments. Scott Dep., at 297:11-18 [Doc. No. 89-3, at 39]. Plaintiff also alleges that a white female co-worker, Sandra Lerch, was also harassed by being "[G]iven extra harsh work loads, actually punched in the side by [Worden], [and] harassed." EEOC Intake Questionnaire, at 3 [Doc. No. 91-1, at 3].

### B. Procedural History

This action was filed in July 2010 in the Arlington County Circuit Court, and was removed to this Court on August 19, 2010. After a round of motions practice, plaintiff filed an Amended Complaint on October 14, 2010, which Health Net answered on November 1, 2010. On April 25, 2011, Health Net filed the Motion along with a *Roseboro* notice. Plaintiff failed to file a timely opposition to the Motion.

On June 1, 2011, due to plaintiff's failure to file a timely opposition to the Motion, this Court issued Orders cancelling the hearing on Health Net's Motion and

denying a separate motion by plaintiff to continue the trial, then set for June 20, 2011. On June 2, 2011, plaintiff filed a document, styled as a "motion to dismiss" the Motion, in which she professed that she was not aware of the Motion. On June 6, 2011, this Court issued an Order denying plaintiff's "motion to dismiss," but directing plaintiff to file an opposition no later than June 17, 2011. The Order included a *Roseboro* notice, and continued trial indefinitely. On June 17, 2011, plaintiff filed her response in opposition to the Motion. Health Net filed its reply on June 23, 2011.

On July 7, 2011, upon consideration of the Motion and the written submissions of the parties, the Court found that the Motion was suitable for disposition without further briefing or oral argument, and cancelled the hearing on the Motion that was scheduled for July 8, 2011.

On July 11, 2011, plaintiff filed three separate pleadings [Doc. Nos. 119-121] which, according to the plaintiff, she filed pursuant to the "advice of counsel," to whom she otherwise obliquely refers as a "consultant." Pltf.'s Reply re: Document 115 [Doc. No. 119], at 1, fn. 1; Pltf.'s Opp. to Mot. to Strike, at 2. In those pleadings, the plaintiff alleges for the first time "[t]he hospital for the Baby Girl provided the home health agency for the discharge." July 8th Notes [Doc. No. 121], at 6-7. Plaintiff did not, however, file any motion for leave to file these surreplies pursuant to Local Civ. R. 7(F)(1). On July 12, 2011, Health Net filed its Motion to Strike, and plaintiff subsequently opposed the Motion to Strike. On July 19, 2011, this Court entered an Order cancelling the scheduled hearing on the Motion to Strike.

## II. ANALYSIS

### A. Health Net's Motion to Strike

Pursuant to Local Civ. R. 7(F)(1), with limited exceptions not relevant here, motions must be accompanied by written brief and the opposing party must file "a responsive brief and such supporting documents as are appropriate." A moving party may file a rebuttal brief, but is not required to do so. *Id.* "No further briefs or written communications may be filed without first obtaining leave of Court." *Id.* "It is the intent behind the rules that parties file complete motions and accompanying documentation and that parties not make supplemental arguments or reassertions upon the whim of the parties." *L.G. Elecs. v. Advance Creative Computer Corp.*, 131 F. Supp. 2d 804, 809 (E.D. Va. 2001).

Plaintiff's July 11, 2011, submissions are precisely the type of after-the-fact pleading the Local Civ. R. 7(F)(1) is designed to prohibit. Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), this Court's June 6, 2011, Order unambiguously stated that plaintiff was permitted to file "a response" and warned plaintiff that she "must identify all facts stated by the defendants with which plaintiff disagrees and must set forth the plaintiff's version of the facts..." Jun. 6, 2011, Ord., at 1. Plaintiff has not moved for leave to file the July 11, 2011, submissions, nor explained why any new facts or contentions contained in those submissions were not included in her timely June 17, 2011, submission.

Moreover, as plaintiff states in her opposition to the Motion to Strike, she filed her additional submissions "upon the advice of counsel" that she was permitted to file additional written submissions. Pltf.'s Opp. to Mot. to Strike, at 2. This statement has

significance in two respects. First, it evidences, her status as a *pro se* litigant notwithstanding, that plaintiff has had access to and the benefit of legal counsel, in light of which it would be inappropriate for this Court to apply the liberal pleading principles that might otherwise apply to *pro se* litigants with respect to these untimely filings. Second, no lawyer could have properly provided the plaintiff with such advice, which is inconsistent with the rules of this Court and contrary to the plain text of this Court's Orders. In any event, nothing in the record before the Court justifies further relieving the plaintiff of the duties imposed on her in responding to the Motion under this Court's Orders and the Local Rules; and for these reasons, Health Net's Motion to Strike will be granted, and the Court will not consider the factual contentions contained in those submissions.[1]

### B. Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48

---

[1] In the alternative, for the reasons stated below, if the Court were to consider the July 11, 2011, submissions, which the Court expressly declines to do, the Court finds that such submissions do not affect the disposition of the Motion for the reasons discussed below.

(1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. In conducting this analysis, the Court may consider the entire record before the Court, but is only required to consider materials cited by the parties. Fed. R. Civ. P. 56(c)(3). The Court, however, is mindful of the principle that documents filed *pro se* are "to be liberally construed" and are to be held to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

### 1. Wrongful Termination and Disparate Treatment

Here, there is no direct evidence of discriminatory conduct; and in the absence of such direct evidence, plaintiff's wrongful termination, disparate treatment, and retaliation claims are subject to the burden-shifting scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and the ensuing line of cases. Under that burden shifting analysis, in order to establish the elements of a *prima facie* case for wrongful termination, the plaintiff is required to produce evidence sufficient to permit a fact finder to conclude: (1) that plaintiff is a member of a protected class; (2) that she suffered an adverse employment action; (3) that at the time the employer took the adverse employment action plaintiff was performing at a level that met her employer's legitimate expectations; and (4) that the position remained open or was filled by a similarly qualified applicant outside the protected class. *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc). The first three elements of a *prima facie* case for disparate treatment

parallel those in wrongful termination cases, but diverge as to the fourth element, which, in a disparate treatment case, requires plaintiff to put forward evidence that "she was treated differently than similarly situated employees outside the protected class." *Brockman v. Snow*, 217 Fed. Appx. 201, 206 (4th Cir. 2007) (applying *Autry v. N.C. Dep't. of Human Res.*, 820 F.2d 1384, 1385 (4th Cir. 1987)).

Here, plaintiff has failed to produce sufficient admissible evidence to establish all the required elements of her *prima facie* case for wrongful termination or disparate treatment. She has satisfied the first two elements, in that she is a member of a protected class and she suffered, by her termination, an adverse employment action. But she has failed to satisfy the other elements. First, she has not produced evidence that at the time of her adverse employment action she was performing at a level that met her employer's legitimate expectations. In this regard, a plaintiff's own testimony "cannot establish a genuine issue as to whether [the plaintiff] was meeting [the employer's] expectations." *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff") (internal quotation marks omitted). Although plaintiff generally disputes that there were valid performance reasons for her termination, she has not offered any extrinsic evidence that would support her conclusion that she was performing at an acceptable level.

Moreover, as to plaintiff's wrongful termination claim, plaintiff has not provided any evidence that her position remained open or was subsequently filled by a similarly qualified individual outside of the protected classes of which plaintiff was a member, and her claim fails on this basis as well. *Hill*, 354 F.3d at 285. As a result, Health Net is

entitled to summary judgment of plaintiff's wrongful termination and disparate treatment claims.[2]

### 2. Retaliation

The elements of a *prima facie* retaliation claim are: (1) that plaintiff engaged in a prior protected activity; (2) she suffered a materially adverse employment action; and (3) the adverse action was taken because of the protected activity. *Gibson v. Old Town Trolley Tours*, 160 F.3d 177, 180 (4th Cir. 1998). If plaintiff establishes this *prima facie* case, the burden shifts to Health Net to proffer a legitimate, non-retaliatory reason for plaintiff's removal, which plaintiff must rebut as a pretext for retaliation. *King*, 328 F.3d at 151 ("following the employer's proffer of a legitimate, non-retaliatory reason for an adverse employment action the burden of persuasion remains with the plaintiff to prove that the employer's reason is pretext, a cover-up for retaliation").

Assuming for the purposes of this motion that plaintiff has satisfied the first two elements, plaintiff has failed to produce any evidence that would establish the third element, or pretext, because she failed to rebut Health Net's evidence that plaintiff's

---

[2] Health Net is also entitled to judgment as a matter of law on plaintiff's disparate treatment claim, to the extent that it is based on alleged mistreatment other than her termination, because she has not established that she suffered any adverse employment action other than her termination. *Brockman*, 217 Fed. Appx. at 205-6 ("The standard for an adverse employment action in a disparate treatment case is different than in a retaliation case: in a discrimination case, our precedent mandates that the plaintiff has the higher burden of showing an 'ultimate employment' action that affects 'hiring, granting leave. discharging, promoting, and compensating'") (internal quotation marks omitted); *see also Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981). To the extent that plaintiff may contend that she was treated differently than other employees when she requested permission to leave during working hours to attend a dentist's appointment, or was taken aside, spoken to, and given a copy of the attendance policy when she was periodically tardy to work, such issues do not rise to the level of an "ultimate employment action" and are instead the same types of issues regarding working hours and work locations that the Fourth Circuit found to be insufficient in *Brockman*.

termination was carried out for legitimate, non-discriminatory reasons, i.e., her deficient performance culminating in the Baby Girl episode. As in the context of a *prima facie* case for wrongful termination or disparate treatment, plaintiff's subjective belief that she performed her duties adequately is not sufficient to raise a triable fact on the issue of pretext in a Title VII retaliation case; and plaintiff has produced no evidence that raises a triable issue as to whether Health Net's legitimate, non-discriminatory reasons for her termination were a pretext for retaliation. *Cox v. Rumsfeld*, 190 Fed. Appx. 329, 332-33 (4th Cir. 2006) (plaintiff's own allegations that proffered reasons for her termination were pretextual was insufficient to avert summary judgment).[3] As a result, plaintiff's retaliation claim also fails.

### 3. Hostile Work Environment

The elements of a hostile work environment claim based on sex or race are that the offending conduct: (1) was unwelcome; (2) based on sex or race; (3) sufficiently severe or pervasive to alter the conditions of plaintiff's employment or create an abusive working environment; and (4) there is some basis for imputing liability to plaintiff's employer. *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 334 (4th Cir. 2010). The Court assumes for the purposes of deciding the Motion that plaintiff has satisfied the first

---

[3] This conclusion would not be altered by plaintiff's allegation in her July 11, 2011, submissions that: "The hospital for the Baby Girl provided the home health agency for the discharge. This document clearly and accessible for Ms Worden in case notes for baby girl." July 8th Notes [Doc. No. 121], at 6-7. As an initial matter, it is not clear what the evidentiary basis in the record, aside from plaintiff's own contention, may be. But more importantly, the alleged deficiencies with plaintiff's performance relate to her failure to identify and obtain coverage for Baby Girl from an appropriate home health agency. That the hospital from which Baby Girl was discharged may have done so is not evidence that plaintiff's job performance was satisfactory, and thus that Health Net's reasons for terminating plaintiff were pretextual.

and fourth elements and considers whether plaintiff satisfied the other two elements of her hostile work environment claim.

In this case, the plaintiff contends that the offending conduct consists of (1) Worden's abusive treatment when plaintiff objected to Worden's efforts to have African-American employees work over the Martin Luther King Jr. Holiday, specifically, the allegation that Worden "threw some papers across the desk at the Plaintiff," and (2) Yaeger's having "[a] racist symbol on her desk re: daughters of the confederacy memorabilia," and that plaintiff complained about the memorabilia to no avail. Opp. to Mot for Summ. J., at 4-5. Plaintiff must first show that she was subjected to this offending conduct "because of" her sex or race. *Mosby-Grant*, 630 F.3d at 334; *see also Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998) (requiring plaintiff to establish "but for" plaintiff's race, plaintiff would not have been the victim of the alleged discrimination). In other words, plaintiff must provide evidence that the conduct of which she complains was, in fact, discriminatory, rather than "the rough edges and foibles" that are present in the absence of discrimination. *See e.g., Hawkins v. PepsiCo., Inc.*, 203 F.3d 274, 282 (4th Cir. 2000) ("Law does not blindly ascribe to race all personal conflicts between individuals of different races ... Instead, legally sufficient evidence is required to transform an ordinary conflict ... into an actionable claim of discrimination"). Here, the plaintiff failed to produce evidence that any of the allegedly offending conduct was directed against her because of her race or sex. Plaintiff herself alleges that white employees were treated abusively as well; and there is no evidence that the plaintiff was requested to work on the Martin Luther King Jr. Holiday to a degree that white employees were not.

15

Moreover, under the established standards for determining whether offending conduct is actionable, plaintiff has also failed to produce sufficient evidence that the offending conduct in this case was sufficiently severe or pervasive. "Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account" support a claim. *See EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (explaining further that "complaints premised on nothing more than 'rude treatment by [coworkers],' ... 'callous behavior by [one's] superiors,' ... or 'a routine difference of opinion and personality conflict with [one's] supervisor,' ... are not actionable under Title VII."). Here, there are no allegations that Health Net employees made racially or sexually charged comments. Rather, plaintiff contends that Health Net's employees engaged in conduct that constituted comparable conduct, specifically Yaeger's display of Daughters of the Confederacy memorabilia and Worden's request that plaintiff work on the Martin Luther King Jr. Holiday, both of which plaintiff regarded as racist conduct, particularly since her complaints were to no avail. Health Net disputes plaintiff's allegations, but even accepting those allegations as true, plaintiff's allegations are insufficient as a matter of law to establish a sufficiently severe or pervasive hostile work environment.

With respect to the alleged Daughters of the Confederacy display, plaintiff does not describe the item(s) in question, any explicit racial content that may have been displayed, the manner in which it was displayed, the time period or circumstances under which plaintiff observed the display, any reference to the items in conversations with her or the circumstances regarding plaintiff's apparent complaints. As a result, the Court cannot conclude, viewing the evidence in the light most favorable to the plaintiff, that the

display created a severe or pervasively hostile workplace environment sufficient to alter the conditions of plaintiff's employment or create an abusive working environment. *See e.g. Barrow v. Georgia Pacific Corp.*, 144 Fed. Appx. 54, 57-58 (11th Cir. 2005) (concluding that serious but "isolated, sporadic instances of racial harassment," including the display of Confederate flag decals, were insufficient to support hostile work environment claim); *Mosby-Grant*, 630 F.3d at 335-36 (finding sufficient evidence of sexual harassment to support hostile work environment claim, but holding that single racist comment by a fellow recruit, and two racially disparaging comments by another recruit during a period of five months, was insufficient to avoid summary judgment). While the alleged offending conduct, if true, raises issues as to whether the working environment was dysfunctional or unpleasant in some respects, it does not establish that the plaintiff was subjected to a legally actionable hostile work environment based on her race or sex.

## CONCLUSION

For the above reasons, the Court will grant Health Net's Motion to Strike Plaintiff's Unauthorized Supplemental Pleadings [Doc. No. 122] and Motion for Summary Judgment [Doc. No. 88].

An appropriate Order will issue.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
August 9, 2011